UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.

LAURENCE D. PASKOWITZ,

     Plaintiff,

v.

JOEL W. LOONEY,
DEAN L. JACOBSON,
RICHARD I. BARR,
JOHN S. HOREJSI,
SUSAN L. CICIORA,
STEWART HOREJSI,
BOULDER INVESTMENT ADVISERS, L.L.C, and
STEWART WEST INDIES TRADING COMPANY, LTD, d/b/a STEWART INVESTMENT
ADVISERS,

       Defendants

   and

BOULDER GROWTH AND INCOME FUND, INC.

     Nominal Defendant

---

**CLASS ACTION COMPLAINT
FOR VIOLATION OF THE INVESTMENT COMPANY ACT AND FOR BREACH OF
FIDUCIARY DUTY**

**<u>JURY TRIAL DEMANDED</u>**

---

Plaintiff, by and through his attorneys, alleges the following upon information and

belief, except as to those allegations concerning Plaintiff, which are alleged upon personal

knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's

investigation, which includes without limitation the: (a) review and analysis of regulatory filings made by Boulder Growth & Income Fund. ("Boulder Income" or the "Fund") with the United States Securities and Exchange Commission ("SEC") or posted on the Internet; (b) review of information concerning the Fund; (c) review and analysis of press releases and media reports issued by and disseminated by or about the Fund; and (d) review of other publicly available information concerning the Fund and other closed-end mutual funds.

## I.   <u>NATURE OF THE ACTION</u>

1.    This is an action against the Fund's Board of directors and others for, among other things, violation of Section 20(a) of the Investment Company Act of 1940 (the "ICA"), by disseminating materially false Proxy Statements dated April 7, 2006 (the 2006 Proxy Statement") and March 8, 2007 (the "2007 Proxy Statement").[1] The 2007 Proxy Statement

---

[1]    Section 20(a) of the ICA provides a private right of action for the dissemination of a false proxy statement.  Section 20(a) was modeled on Section 14 of the Securities Exchange Act of 1934.  The Supreme Court held that the right to vote based on a true and complete proxy statement is ***most basic to the concept of corporate suffrage and must be protected.*** As the Supreme Court held:

The purpose of § 14 (a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13.  It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders." Id., at 14.  "Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S. Rep. No. 792, 73d Cong., 2d Sess., 12.  These broad remedial purposes are evidenced in the language of  the section which makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." (Italics supplied.)

(attached hereto as Exhibit A) culminates a scheme to unlawfully enrich Fund manager Stewart Horejsi and his affiliates to the detriment of the Fund and its public shareholders. The 2007 Proxy Statement asked shareholders to approve a seemly innocuous expansion of the investment latitude of the fund manger, without disclosing the material fact that this approval would immediately trigger the announcement of a "Rights Offering" where:

a.      tens of millions of new Fund shares will be sold at an extreme discount;

b.      the existing shareholders will be coerced into participating just to minimize the damage which the Rights Offering has and will cause;

c.      the Rights Offering will enrich the Fund's manger by millions of dollars a year, while the net asset value of the fund will not materially increase, and the market value of the Fund has and will materially *decrease*; and

d.      When the Proxy Statement was approved, the market price of the Fund was $15.10 per share. The announcement of the Rights Offering caused it to immediately drop to under $11 per share, a drop of over 27 percent.

2.      The machinations of Horejsi and his cohorts was revealed in an article in published in TheStreet.com, annexed hereto as Exhibit B.

3.      Plaintiff also seeks damages for a violation of ICA Section 36(b) against Boulder Investment Advisers, L.L.C. ("BIA") and Stewart West Indies Trading Company, LTD, d/b/a

*J. I. Case Co v. Borak*, 377 U.S. 426, 430-431 (1964)

Stewart Investment Advisers ("SIA") for breach of fiduciary duty for exacting excessive advisory fees upon the conclusion of the Rights Offering  and against the Fund Directors, Horejsi, BIA and SIA for breach of fiduciary duty under state law.

## SUMMARY OF THE ALLEGATIONS

4.     This case involves the self-aggrandizing and illegal actions of defendant Stewart Horejsi ("Horejsi") who acts as the investment manager for the Fund through BIA and SIA which he controls.  Horejsi currently controls the Board of the Fund, having taken over the Fund in 2002 after waging several Proxy contests to oust USLIFE Advisors Inc. as the investment advisor, and its representatives as the Fund's directors.

5.     Horejsi has stacked the Board with directors allied with him (including his own children) who do his bidding, and a long-time business and personal friend, Joel W. Looney. After Horejsi gained control of the Fund, he installed himself, through BIA and SIA, as the investment advisor to the Fund, and Fund Administrative Services, LLC ("FAS"), a company controlled by Horejsi to administer the fund, all in an effort to maximize payments to him. The Fund name was changed from USLIFE Income Fund, Inc. to the Boulder Growth & Income Fund, Inc.

6.     Horejsi's method of gaining control of funds has been to purchase a significant share position in a closed end mutual fund ("CEF"), and then to wage proxy contests designed to oust management and to install key Fund directors beholden to him on their boards.  In some instances, companies controlled by him have been installed as the investment advisors and/or the administrators, so as to reap huge fees.

7.      In addition to the take-over of the Fund, in 1999 Horejsi took over the Preferred

Income Management Fund in a proxy contest, renamed it the Boulder Total Income Fund, Inc.,

installed BIA and SIA as the investment advisors and FAS as the administrator. Horejsi also took

over the operation of the First Financial Fund, Inc. through a proxy contest and installed a Board

influenced by him, which then selected FAS as Fund administrator.

8.      Horejsi has also attempted to take over the Neuberger Berman Real Estate Income

Fund in 2004 and the Putnam California Investment Grade Municipal Trust in 2007.  All of these

efforts were designed to enrich Horejsi and his affiliates. .

9.      On May 11, 2007 an article published in TheStreet.com revealed that Horejsi's

operation of the Fund has been a shell game primarily designed to enrich Horejsi.  Horejsi

devised a scheme whereby the Fund purchased stocks just before they went ex-dividend, and

sold such stocks after receiving the dividend to generate losses. By so doing, the Fund

commenced making distributions at a rate of approximately 11 percent per year, which created

the illusion of an improvement in the Fund's fortunes but which in reality represented the return

to the of the investors of their own money, now denominated as "dividends." However, the

attractive payout inflated the market price of the Fund, causing it to trade at a 65 percent

premium to the fund's net asset value. [2]

---

[2]      The Fund is a CEF.  CEF's issue a set number of shares, which trade on a recognized
exchange, which in the case the Fund, the New York Stock Exchange.   Unlike an open-ended
mutual fund, the shares are not purchased from the fund, but on the open market.  Underlying the
fund is the net asset value ("NAV") which is the dollar value of the net assets attributable to each
share.  A CEF's share price may trade at a discount to, or a premium to the NAV.  In the case of
Boulder  Income, starting in the second half of 2006 and into 2007, it traded at a large premium
to the NAV, due to the high payout. However, the Fund's net assets did not materially increase
during that period.

10.     The genesis of this scheme may be found in the Proxy Statement disseminated on April 7, 2006.  Horejsi had conceived of a scheme to inflate the market price of the Fund so as to be in a position to effect the coercive and dilutive Rights Offering, and to potentially triple the number of shares in the Fund so as to materially increase his investment advisory and administrative fees.  (A copy of the April 7, 2006 Proxy Statement is annexed hereto as Exhibit C.)

11.     To effect this scheme, he caused the Directors to propose in the Proxy Statement dated April 7, 2006 the request for approval of a dividend policy distribution policy for the Fund.  While he knew the real purpose for the change in the dividend policy of the Fund, it was not revealed in the Proxy. The proposal contemplated the adoption of a managed distribution policy whereby the Fund would make monthly distributions to all common shareholders at an initial rate of $0.10 per share.

12.     The Proxy Statement did not disclose that the real purpose was to inflate the market price of the Fund so Horejsi could thereafter effect a coercive and dilutive Rights Offering to vastly increase the number of shares in the Fund, and his fees. The failure to disclose the true purpose for the change in the investment and distribution policy constituted a material violation of Section 20(a) of the ICA and a breach of fiduciary duty under state law.

13.     Thereafter, the Fund paid out monthly managed distributions. Because of the high payout, which soon increased to $.0115 per share per month, the market price of the Fund began climbing in August, 2006.  By April 27, 2007, the date of the Proxy vote, the Fund was trading at $15 per share, up from $7.85 at the end of April 2006. a rise of 92.3 percent. However, the NAV

rose only 7.7 percent from the end of April 2006, to the end of April 2007. Upon the announcement of the Rights Offering, the benefits of the managed dividend distributions evaporated, as the market price of the Fund dropped from $15.10 to below $11.00 per share, a decrease of 27 percent, or over $40 million in shareholder value.

14.     The Rights Offering is unfair and coercive:

a.     Since the shares in the Offering are sold at a substantial discount, the announcement of the Rights Offering has caused the market price to materially decline;

b.     If one doesn't exercise the rights, such shareholder will suffer extreme dilution of their equity position in the Fund. The term Rights Offering is a misnomer. Rather, shareholders are *forced* to purchase more shares; and[3]

c.     Assuming that the Rights Offering is fully subscribed, approximately $209 million will be raised for the Fund, which, when added to the existing Fund net assets, will give the Fund net assets of approximately $339 million. Horejsi's affiliates' investment advisors' fees will essentially triple to approximately $4.23 million annually, post the Rights Offering, a huge increase which has been obtained by deception. The administrative fees will also increase.

15.     By reason of the foregoing illegal manipulation and false Proxy Statements the shareholders will suffer irreparable harm by reason of this coercive and dilutive Rights Offering. The Rights Offering is carried out based on a subterfuge and deception. It will severely dilute existing shareholders. It has and will continue to cause them financial and other harm which is

---

[3] The Rights Offering permits current shareholders to purchase one additional share in the Fund for the higher of 80 percent of the market price at the time the rights become effective, or the NAV. The Offering also provides for an oversubscription of one additional Right, so that if the Offering is fully subscribed, the size of the Fund will triple.

difficult or impossible to measure. Once the Rights are disseminated and traded and exercised, there is no way to call the newly issued shares back and to restore everyone to their prior positions. Shareholders will have expended additional funds which will have been paid to the Fund and invested by the Fund in additional investment securities. Furthermore the preliminary registration statement dated May 7, 2007 disseminated in connection with the Rights Offering is false and misleading as well in that it does fully and properly describe the deleterious effects of this or future Rights Offerings in the risk factors section and elsewhere. Plaintiff seeks to preliminarily and permanently enjoin the effectuation of the Rights Offering.

16.     Plaintiff seeks damages on behalf of the Fund for violations of section 36(b) of the ICA, and damages for breach of fiduciary duty.

## III.     **JURISDICTION AND VENUE**

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331, Sections 36(b) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b), and 43 and supplemental jurisdiction, 28 U.S.C. 1367.

18.     This action arises under Sections 20(a) and 36(b) of the ICA, 15 U.S.C. §§ 80a-20(a) and 36(b).

19.     This action also arises under 28 U.S.C. 1332 in that plaintiff is a citizen of New York, and all defendants are citizens of states other than New York. The amount in controversy with respect to the injunction is greater than $75,000, excluding interest and costs. The amount in controversy is in excess of $200 million, the amount the Fund seeks to raise in the Rights Offering.

20.   Venue is proper in this District pursuant to Section 44 of the ICA in that each defendant may be found in this District or transacts business in this District.

## IV.   **PARTIES**

21.   Plaintiff held 700 Fund shares prior to the April 30, 2007 announcement of the Rights Offering and continues to hold Fund shares.  Plaintiff is a citizen of the State of New York.

22.   Nominal defendant Boulder Income operates as a non diversified, closed-end management investment company. The Fund is dominated by Horejsi through the Ernest Horejsi Trust No. 1B, which owns 20.89 percent of the 11,372025 common shares outstanding, and through the ownership of all of the 1,000 outstanding shares of the Auction Market Preferred Stock ("AMPS").  The AMPs are entitled to elect two of the five the Fund directors.  The Fund trades on the New York Stock Exchange under the symbol "BIF."  The Fund is named as a nominal defendant so as to enable the Court to provide complete relief as to the claims asserted herein.  The Fund is a citizen of Colorado, where it is headquarter, and Maryland, where it is incorporated. No damages are sought from the Fund. Horejsi is a citizen of a state other than New York.

23.   Defendant Stewart Horejsi is the manager of various Horejsi family trusts which own shares of the Fund, the Boulder Total Return Fund, and the First Financial Fund. Through BIA and SIA he acts as the investment manager of the Fund.  Stewart Horejsi has selected two of his children, plus arranged the election of  long-time associate Joel Looney, to serve as Fund directors. Together, they constitute three of five directors--a majority of the Fund's Board. The officers of the Fund are employed by BIA and SIA.   BIA and SIA, the Fund investment

advisors, are companies controlled by defendant Horejsi, and are headquartered in Boulder, Colorado and Barbados respectively. BIA and SIA employ Stewart Horejsi as the Fund's portfolio manager. When Stewart Horejsi resides in the United States, he is employed by BIA and when he resides in Barbados, he is employed by SIA.

24.     The Fund is dominated by the Horejsi family and their associates. They control a majority of the Fund Board. In addition to having two Horejsi family members on that Board, *viz.,* defendant John S. Horejsi and Defendant Susan L. Ciciora, his children, on the five person Board, Defendant Joel W. Looney, is a Horejsi loyalist and in no way an independent director, as discussed below. In addition to dominating the Fund, through various family trusts, Horejsi also controls the Boulder Total Return Fund, Inc. ("Boulder Total Return"). Boulder Total Return has also retained BIA and SIA as its investment advisors. The Horejsi family also has a 38.4 percent interest in the First Financial Fund, Inc. ("First Financial"). Stewart Horejsi obtained effective control of First Financial in a multi-year proxy battle with prior management in 2002 and 2003.

25.     Defendant Joel W. Looney ("Looney") has been a director of the Fund since 2002 and Chairman since 2004. He has been a director of the Boulder Total Return Board since 2001, and Chairman of the Horejsi-influenced First Financial Board since 2003. In fiscal 2006, Looney was paid $31,500 for his role as Chairman of the Fund Board, $30,500 for his role as Chairman of the Boulder Total Return Board and $35,500 for his role as Chairman of the First Financial Board. From the late 1980's until January, 2001, Defendant Looney served, without compensation, as one of three trustees of the Mildred Horejsi Trust, an affiliate of the EH Trust, one of several of the Horejsi family trusts. As Chairman of First Financial, Looney engineered

the retention of a Horejsi owned administrative agent, FAS, to provide administrative services to First Financial for substantial compensation. Looney is beholden to Horejsi and the Horejsi family and is not independent. Whenever Horejsi takes control of a Fund, Looney can often expect a plum appointment, fees and benefits. He is a citizen of the State of Kansas.

26.     Defendant Dean L. Jacobson ("Jacobson") has been a director of the Fund since April 2006, a director of Boulder Total Return since 2004. and a Director of First Financial since 2003. In fiscal 2006, he was paid $71,826 for his role at the three funds.  He is a citizen of a state other than New York.

27.     Defendant Richard I. Barr ("Barr") has been a director of the Fund since April 2002, a director of Boulder Total Return since 1999 and Chairman of the Board since 2003, director of First Financial since 2001. In fiscal 2006, he was paid $84,826 for his role at the three funds.  He is a citizen of a state other than New York.

28.     Defendant John S. Horejsi ("J. Horejsi") is the son of Stewart Horejsi and since 2004, a director of the Fund.  He has been a director of Boulder Total Return since 2006 and a director of First Financial since 2006.  The Fund has acknowledged in the Proxy Statement that defendant Horejsi is an interested director as a result of his beneficial ownership of the Fund shares and by virtue of his indirect beneficial ownership of BIA and FAS. He is a citizen of a state other than New York.

29.     Susan L. Ciciora ("Ciciora") is the daughter of Stewart Horejsi and a director of the Fund since December 2006, a director of the Boulder Total Return since 2001 and a director of First Financial since 2003.  The Fund has acknowledged in the Proxy Statement that defendant Ciciora is an interested director as a result of her beneficial ownership of the Fund shares and by

virtue of her indirect beneficial ownership of BIA and FAS. She is a citizen of Illinois.

30.     Defendant BIA is one of the investment advisors for the Fund, and is owned by Stewart Horejsi. It is a citizen of states other than New York.

31.     Defendant SIA is one of the investment advisors for the Fund and is owned by Stewart Horejsi.  It is a citizen of Barbados.

32.     Defendants Looney, Jacobson, Barr, J. Horejsi and Ciciora are sometimes referred to as the Director Defendants. Looney, J. Horejsi and Ciciora are sometime referred to as the Horejsi Directors.   Defendants BIA and SIA are sometimes refereed to as the Investment Advisor Defendants.

## V.     CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action as to Counts I, II and IV of the Complaint pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all holders of the Fund shares as of the close of trading on April 30, 2007, and who continue to hold their shares.  Excluded from the Class are Defendants, the officers and directors of the Fund, members of the immediate families of the individual defendants and each of their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or has had a controlling interest.

34.     This action is properly maintainable as a class action because:

a.     the members of the proposed Class in this action are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the

thousands.  As of May, 2007, the Fund had 11,383,335 shares of common stock outstanding.

b.      Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of Section 20(a) of the ICA, and state law as alleged herein;

c.      Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

d.      A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them.  The likelihood of individual Class members prosecuting separate claims is remote;

e.      Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f.      The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i.      whether Defendants' acts and/or omissions as alleged herein violated Section 20(a) of the ICA and state law;

ii.     whether the Proxy Statements were materially misleading or materially omissive;

iii.    whether Defendants acted wrongfully;

    iv.  whether Plaintiff and the Class have been irreparably harmed and

    v.  whether the Class is entitled to a permanent injunction.

**VI.**  **SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS**

  35.  On April 7, 2006 the Fund disseminated the 2006 Proxy Statement to the Fund

shareholders.

  36.  In a letter to shareholders accompanying the 2006 Proxy Statement, Defendant

Looney stated in part:

> The first non-routine proposal, Proposal 2, is for stockholder approval of a managed distribution policy for the Fund. The proposal contemplates a managed distribution policy in which the Fund would make a consistent, but not assured, monthly distribution to all common stockholders. In addition to the disclosure accompanying the discussion of Proposal 2, the accompanying proxy statement contains a Question & Answer section that addresses a number of questions that stockholders may have regarding the proposed managed distribution policy.

> As Chairman of the Board, I encourage you to support each of the proposals. After careful review by those Directors who are not "interested persons" as defined in the Investment Company Act of 1940 (the "Independent Directors"), the Board of Directors unanimously approved and has recommended to stockholders that they approve each of the proposals.

> We hope you plan to attend the meeting. Your vote is important. Whether or not you are able to attend, it is important that your shares be represented at the Meeting. At your earliest convenience, we ask that you please complete, sign, date and return the enclosed Proxy Card or authorize proxies via telephone or the Internet to cast your vote at the meeting.

> On behalf of the Board of Directors and the management of Boulder Growth & Income Fund, I extend our appreciation for your continued support.

  37.  The 2006 Proxy Statement purported to explain the reasons for the change in the

investment policy:

> Question 5: Why is the Fund implementing a Managed Distribution Policy, and what advantages does this provide?

Answer: A managed distribution policy allows a fund to provide a regular, periodic distribution to its common stockholders which is not dependent on the amount of income earned or capital gains realized by the fund. An equity fund, such as the Boulder Growth & Income Fund, is designed for investors to participate in a professionally managed portfolio of equity investments. Over the long-term, equity investments have historically provided higher total returns than fixed income investments such as bonds. However, unlike most fixed income funds, which pay stockholders a regular dividend based on the fund's investment income, equity funds generally pay only one dividend per year consisting of a relatively small amount of net investment income and any net realized capital gains. A managed distribution permits a fund to distribute a predetermined monthly amount, regardless of when or whether income is earned or capital gains are realized. A managed distribution policy recognizes that many investors are willing to accept the potentially higher asset volatility of equity investments, but would prefer that a consistent level of cash distributions are available to them each month for reinvestment or other purposes of their choosing. Furthermore, the Fund historically has traded at a discount to its net asset value ("NAV"). In recent years, managed distribution policies appear to have been effectively used to narrow trading discounts for closed-end funds, and the Board believes that the Managed Distribution Policy could have a similar effect on the Fund's discount. Of course there can be no assurance that the Managed Distribution Policy will narrow the Fund's discount or, if this does occur, that it will persist over the long term.

38.    The 2006 Proxy Statement stated that the Fund Board approved the plan after

discussions with the management of the Fund:

Considerations by the Board of Directors. The Board commenced its analysis of managed distribution policies in early 2004, and met several times during the first six months of the year to consider implementing a managed distribution policy. In July 2004, the Board determined that it was in the best interests of the Fund and its stockholders to pursue a managed distribution policy, and thus authorized management to submit an application to the SEC for exemptive relief from Section 19(b) of the 1940 Act and Rule 19b-1. Since the application was submitted, the Board has held a number of discussions at regular meetings regarding the delay in the SEC's approval of the exemptive application and alternatives available to the Fund for making managed distributions in conformance with Section 19(b) and Rule 19b-1. Most recently, the Board held a special meeting on March 6, 2006, called for the purpose of considering a stockholder-approved managed distribution policy as described in this Proposal. At this meeting, the Directors met with management of the Fund and Fund counsel to discuss the significant aspects of the Managed Distribution Policy. At this meeting, the Board also unanimously resolved to recommend the Managed Distribution Policy for approval by stockholders.

39.     The 2006 Proxy Statement was materially false and misleading since the *real* reason for the proposal and the requested shareholder ratification was to use the new distribution plan to inflate the market price of the Fund's shares so as to make the dissemination of the Rights Plan a viable option.  Absent a positive spread between the market price of the Fund and its NAV, a Rights Offering was unlikely.

40.     Defendants Horejsi, J. Horejsi, BIA SIA and Looney were aware of the real reason behind the managed distribution proposal.

41.     The 2006 Proxy Statement was rendered materially false and omissive by the failure to reveal and describe that the application of the managed distribution plan was clearly tied to the planned Rights Offering. Thus the defendants promoted the investment strategy changes, but failed to reveal the Horejsi's true purpose for the requested change as part of a plan to enrich himself.

42.     On March 8, 2007 the Fund disseminated the 2007 Proxy Statement to the Fund shareholders.

43.     In a letter to shareholders accompanying the Proxy Statement, Defendant Looney, stated in part:

> There is also one non-routine proposal contained in this Proxy, Proposal 2, which changes the Fund's current industry concentration policy and clarifies and expands the scope of real estate companies that can be included in determining the threshold under the Fund's investment restriction regarding industry concentration.
>
> Under its present investment restriction, the Fund cannot invest more than 25% of its assets in the same industry except with respect to real estate investment trusts ("REITs") and related companies in the same industry as REITS (the "Industry Restriction"). In addition, the Fund has adopted a policy to concentrate in REITs and related companies, pursuant to which it must, under normal market conditions, invest more than 25% of its assets in REITs and related companies.

Proposal 2 amends the Industry Restriction so that the Fund is permitted to include a broader range of real estate related companies in determining compliance with the Industry Restriction rather than solely REITs and related companies. Proposal 2 designates "real estate related companies" rather than REITs as the "industry" with respect to which the Fund can exceed the 25% limitation. "Real estate related companies" would include REITs, but would also include a much broader range of equity and/or debt securities of companies in or primarily servicing the real estate industry or deriving a substantial portion of their revenue from, or having a substantial portion of their assets invested in, real estate. Proposal 2 is a change to a fundamental investment policy of the Fund and thus its adoption requires the affirmative vote of a majority of the Fund's stockholders. See *Vote Required* on page 9.

As Chairman of the Board, I encourage you to support each of the proposals. After careful review by those Directors who are not "interested persons" as defined in the Investment Company Act of 1940 (the "Independent Directors"), the Board of Directors unanimously approved and has recommended to stockholders that they approve each of the proposals. We hope you plan to attend the meeting. Your vote is important. Whether or not you are able to attend, it is important that your shares be represented at the Meeting. At your earliest convenience, we ask that you please complete, sign, date and return the enclosed Proxy Card or authorize proxies via telephone or the Internet to cast your vote at the meeting.

On behalf of the Board of Directors and the management of Boulder Growth & Income Fund, Inc., I extend our appreciation for your continued support.

No mention was made of the impending Rights Offering.

42.     The Defendants were very careful to not to discuss anything concerning the impending Rights Offering, or the huge benefit that the Offering would provide to the Horejsi family, by expanding the Fund and increasing total management fees dramatically.  Since the ICA imposed specific voting requirements on the proposal to relax the restriction, revealing the whole truth would likely have caused the scheme to fail:

*Vote Required*. Approval of Proposal No. 2 requires a 1940 Act Majority Vote of Common Stock. For purposes of this Proxy Statement, a 1940 Act Majority Vote of Common Stock means the affirmative vote of the lesser of (a) 67% or more of the Shares of Common Stock present or represented by proxy at the Meeting or (b) more than 50% of the outstanding Shares of Common Stock.  (Proxy Statement p. 9.)

44.     The Proxy Statement gave the reasons for the recommendation:

> ***Reason for this Proposal***. The present Industry Restriction and concentration
> policy have been beneficial to the Fund and stockholders and REITs have
> performed well since their adoption. However, the Advisers want to give the Fund
> sufficient flexibility to invest in a broader range of real estate related companies
> so as to mitigate the volatility of being overly concentrated in the Fund's current
> narrow asset class (i.e., REITs). In other words, the Advisers would like to avoid
> being limited to investing solely in REITs in determining the Fund's compliance
> with the Industry Restriction and diversify somewhat into the equity or debt
> securities of other companies who are in the real estate industry or derive a
> substantial portion of their revenue from, or have a substantial portion of their
> assets invested in, real estate. (Proxy Statement p. 8.)

45.     The Proxy Statement was rendered materially false and omissive by the failure to reveal and describe the impending Rights Offering which was clearly tied to the sought after change in the investment restriction.  Rather, defendants misrepresented in the Proxy Statement that the relaxation of the investment restriction was really only a "clarification", *e.g.* a technical change without any adverse consequences attached, and nothing to worry about. (Proxy Statement p.  iii.)  This type of chicanery violates the proxy laws. *See Sample v. Randall Bearings, Inc.* 914 A.2d 647 (Del Ch. 2007)(upholding claims of breach of fiduciary duty in disseminating a Proxy Statement promoting capitalization changes, but failing to reveal the insiders' true purpose for the requested change as part of a plan to enrich themselves.)

46.     The Proxy Statement was also rendered materially false and misleading by the Director Defendants' failure to reveal that the approval of the proposal would trigger the Rights Offering, along with both the benefits to be realized by Horejsi, and the detriments to be suffered by the public shareholders.

47.     The relaxation of the investment restriction was an integral part of the Rights Offering plan since to make the Fund more attractive to potential investors who might seek to purchase Rights, it was necessary and desirable to broaden the investment  criteria available to

18

the Fund to attract new interest. This was a attractive marketing  ploy to increase interest in the Rights Offering and hopefully generate increased investment, which would inure to Horejsi' benefit.

48.     On April 30, 2007, just subsequent to the Fund's Annual Meeting where the Fund shareholders approved the change to the investment restrictions on the Fund, the Fund disseminated a press release  which stated in relevant part:

### BOULDER GROWTH & INCOME FUND, INC. ANNOUNCES RIGHTS OFFERING, RESULTS OF ANNUAL MEETING AND MONTHLY DISTRIBUTIONS

Boulder, Colo. –  (BUSINESS WIRE) – April 30, 2007 – The Boulder Growth & Income Fund, Inc. (NYSE: Boulder Income) held its annual stockholders' meeting in Scottsdale, Arizona on Friday, April 27, 2007, at which time stockholders elected Richard I. Barr, Joel W. Looney, Dr. Dean L. Jacobson, John S. Horejsi, and Susan L. Ciciora to serve as directors for a one year period.  Stockholders also approved a proposal to change the Fund's industry concentration policy so that the Fund must invest more than 25% of its assets in "real estate related companies" rather than solely in REITs and related companies.

At the regularly scheduled Board of Directors meeting held the same day, the Board approved a 1-for-1 transferable Rights Offering for the Fund. The Rights Offering will permit stockholders to acquire one new share of the Fund for each right held at a subscription price equal to the greater of net asset value (NAV) on the expiration date of the offering or 80% of the volume-weighted average sales price of a share of the Fund's common stock on the New York Stock Exchange (NYSE) on the expiration date of the offering and the four immediately preceding trading days.  It is expected that the rights will be transferable and will be registered and admitted for trading on the NYSE.  In addition to the shares offered in the primary subscription, the Fund will offer an over-allotment of 11.3 million shares to over-subscribing stockholders.

The offering is subject to the filing of a registration statement covering the rights and shares to be issued and to other customary regulatory filings and approvals. The Fund intends to file a registration statement with the SEC within the next two weeks.  Any Rights Offering conducted by the Fund will be made only by means of a prospectus.  Subject to making the necessary filings with the SEC and receiving subsequent SEC approval, it is expected that the Rights Offering will be conducted in June or July of 2007. The record date for the offering has not been set.

*****

The Boulder Growth & Income Fund, Inc. is a closed-end non-diversified management investment company.  The Fund currently has 11,377,908 shares of common stock outstanding.  As of April 27, 2007, the Fund's net asset value was $9.19 and the closing market price was $15.06, a premium of 63.9% to NAV.

49.    This came as a complete shock to the market and caused the market price of the Fund to materially decline as discussed above.

50.    While the Boulder Funds had previously placed on its Website a narrative concerning the possibilities of Rights Offerings and their effects, it completely mischaracterized the risks: [4]

We believe that size matters. Among other things, increasing the size of a fund necessarily reduces the fund's expense ratio, ***thus ultimately benefiting stockholders.*** Therefore, we may conduct "Rights Offerings" from time to time in order to increase the size of the Funds. In the typical Rights Offering a fund will issue "rights" to current stockholders permitting them to purchase additional fund shares, usually at a discount to market price. ***Stockholders who do not exercise their rights may be diluted, unaffected or enriched by the offering (i.e., the net asset value of their shares after the offering may be less, the same as, or more than before the offering, depending upon whether the offering price is less, the same or more than the then NAV).*** Rights may be transferable, allowing the holder to sell them in the open market to others who may wish to exercise them. When Rights Offerings are announced, arbitrageurs often sell the stock short, driving the price down with the intention of buying and exercising the rights to cover their short position. ***This usually widens the discount but is not detrimental to the owners as long as they don't sell during this period.*** Since the Funds may conduct Rights Offerings from time to time, we urge you to buy Fund shares only if you are comfortable knowing there may be Rights Offerings, and if you are sufficiently disciplined to avoid selling during the periods before and after the offerings. ***A few months after a Rights Offering ends, the discount usually returns to the level that reflects investors' sentiment about the future of that fund without any influence from the rights activity.*** However, there is no certainty in this occurring. (Emphasis added.)

51.    This narrative is materially misleading.  Indeed, the statement that:

Stockholders who do not exercise their rights may be diluted, unaffected or enriched by the offering (i.e., the net asset value of their shares after the offering may be less, the same as, or more than before the offering, depending upon whether the offering price is less, the same or more than the then NAV).

---

[4]    http://www.boulderfunds.net/Closed%20End%20Funds.htm

is materially deceptive.  First, since a Rights Offering is almost always sold at a discount in order to encourage exercise of the issued Rights, the market price of the shares **must** decline, separate and apart from how the offering may affect net asset value.  Thus, stockholders who do not exercise their rights *will* be  diluted and will in almost all situations suffer an immediate decline in the market price of their shares.   While the *NAV* may or may not be unaffected, one's investment in the fund will certainly be materially affected since the market price will decline, and may decline, as here, ***very substantially***.

52.    The statement that:

> When Rights Offerings are announced, arbitrageurs often sell the stock short, driving the price down with the intention of buying and exercising the rights to cover their short position. This usually widens the discount but is not detrimental to the owners as long as they don't sell during this period.

is materially false.  When a Rights Offering is announced, it is almost always announced at a discount to the then current market price, especially if the Fund is trading at a premium.  As a result, the market price of the fund will decline, and often declines very materially. Since many new shares are being introduced into the market at a very substantial discount, the decline cannot be solely attributed to ***arbitrageurs***.  Further, the claim that the discount is not detrimental as long as one does not sell during this period is also materially false, since if a fund declines as has this Fund, one may not see the prior market prices for years, if ever.  Moreover, the statement makes no mention of the coercive effect of the Rights offering, and the differences in how shareholders of the Fund when the Rights Offering is announced react--the shareholder who does not exercise and buy more shares at the discounted price will suffer much more severely than the shareholder who accedes to this conversions, and buys more shares.

53.    The statement that:

> A few months after a Rights Offering ends, the discount usually returns to the level that reflects investors' sentiment about the future of that fund without any influence from the rights activity

is materially false.   This is double-talk suggests that a Rights Offering is just a temporary blip, and that once completed the fund's market will return to or near prior levels. There is no basis for this to be true in most cases, and especially in instances where the Rights Offering is made when the Fund is trading at a premium, and not a discount.  Like any stock, the fund will trade on the market perception of its value going forward, which has little to do with its prior market value.

51.    The fees to be paid to defendants Horejsi, BIA and SIA are violative of Section 36(b) of the ICA.  Should the Rights Offering close, the fees paid to these Defendants will skyrocket and may triple, without any offset for efficiencies and economies of scale.  By vastly expanding the Fund using inequitable methods, these Defendants will be overcompensated in violation of Section 36(b).

54.    Other funds pay fees to investment advisors which are significantly less than the percentages paid by the Fund, and have in place a sliding scale with Break Points.  Horejsi is has been paid fees of 1.25 percent of the Fund's average monthly total net assets with no sliding scale, a significant overpayment. The fee schedule will be modified after the Rights Offering, but Horejsi will receive the same percentage on the Fund's total net assets up to $400 million. Thus Horejsi's fees may in fact triple. For instance, the investment advisor fee percentages for the Nuveen Tax-Advantaged Floating Rate Fund ("JFP"), a fund with net assets in the $200 million range, were less than one percent. The PIMCO Global StocksPlus & Income Fund, ("PGP") a fund new in 2005, and with assets of $260 million as of March 2007, pays the investment manager a one percent investment advisors fee.  Tri-Continental Corporation, a large capital

appreciation fund, pays management fees of 0.45 percent. [5]

55.     What has occurred here was a carefully engineered scheme whereby the Defendants disseminated materially false Proxy Statements to obtain the Fund shareholder approval to change the investment strategy and then relax the investment restriction so that Horejsi could inflate the Fund's market price and then disseminate an unfair and coercive Rights Offering so as to potentially triple the gross investment advisory fees payable by the Fund.   This conduct violates Sections 20(a) and 36(b) of the ICA , and these defendants' fiduciary duties.

56.     The preliminary Registration Statement the Rights Offering dated May 7, 2007 continues the previous deception.  Although rights holders are being asked to buy hundreds of millions of dollars worth of Fund shares, they are never told of the effect this Rights Offering has had on the stock, and what the effect may be of future similar rights offerings.  Those seeking such material information may visit the Fund's website, but there all they will find is reassuring, inaccurate, *misinformation.*

57.     Because the information contained in the Registration Statement is vital to an investment decision, it must be full and complete, and the "Risk Factors" section must disclose all risk factors, not just some.  The Rights Offering must be enjoined, not only because of its coercive and dilutive nature, and not only because it sprung from a misleading Proxy vote, but also because  the Registration Statement for the shares to be issued is itself deceptive.

## COUNT I

---

[5]     In complete contrast with the fees ***sought*** by Edward Horejsi, when the fees are being ***charged*** to Edward Horejsi he believes they should be fair and reasonable. In the First Financial, Fund where Horejsi is a significant shareholder and controls the Board, but is not the investment manager, the investment advisory fees are established on a sliding scale with Break Points. Even after a recent substantial increase they are far less than what Horejsi is charging the Fund.

**(For Violation of Section 20(a) of ICA against
Defendants Looney, and J. Horejsi as to the
2006 Proxy Statement and Looney, J. Horejsi
and Ciciora as to the 2007 Proxy Statement )**

58.     Plaintiff repeats and realleges paragraphs 1 through 57, as if set forth fully herein.

59.     The Defendants named herein failed to fully disclose all material information in the Proxy Statements.

60.     More specifically, the 2006 Proxy Statement failed to fully disclose all facts regarding the reasons for the changes in the payout on the Fund and the policy on restricted investments.

61.     The 2007 Proxy Statement failed to fully disclose all facts regarding:

       a.     the impending Rights Offering; and

       b.     the expansion of the fees to be paid to the Horejsi, BIA and SIA.

62.     Accordingly, based on the foregoing, each of these Director Defendants named herein breached their duty of full disclosure and complete candor by intentionally failing to fully and fairly disclose all material information in the Proxy Statements.

63.     As a result of the misconduct alleged herein, Plaintiff is entitled to a declaration that the votes on the Proxy Statements were a nullity and to enjoin the consummation of the Rights Offering as part and parcel of the scheme to disseminate the false Proxy Statements.

## COUNT II
**(For Violation of Section 20(a) of ICA against
Defendant Barr as to the 2006 Proxy Statement and against
Defendants Barr and Jacobson as to the 2007 Proxy Statement )**

64.     Plaintiff repeats and realleges paragraphs 1 through 57, as if set forth fully herein.

65.     The Defendants named herein were negligent in failing to cause the Proxy Statements to fully disclose all material information.

66.     More specifically, the 2006 Proxy Statement failed to fully disclose all facts regarding the reasons for the changes in the payout on the Fund and the policy on restricted investments.

67.     The 2007 Proxy Statement failed to fully disclose all facts regarding:

    a.      the impending Rights Offering; and

    b.      the expansion of the fees to be paid to the Horejsi, BIA and SIA.

68.     Accordingly, based on the foregoing, each of these Defendants named herein breached their duty of full disclosure and complete candor by negligently failing to assure themselves that the Proxy Statements fully and fairly disclosed all material required information.

69.     As a result of the misconduct alleged herein, Plaintiff and the Class are entitled to a declaration that the votes on the Proxy Statements were a nullity and to enjoin the consummation of the Rights Offering as part and parcel of the scheme to disseminate the false Proxy Statements.

## COUNT III
**(For Violation of Section 36(b) of ICA against the Investment Advisor Defendants )**

70.     Plaintiff repeats and realleges paragraphs 1 through 56, as if set forth fully herein.

71.     The Investment Advisor Defendants have violated Section 36(b) by breaching their fiduciary duties by the impending receipt of fess which are excessive.

72.     The Rights Offering serves no purpose except to inflate the income of these Defendants while causing serious harm to the Fund.  The Investment Advisor Defendants are breaching their fiduciary duty by receiving commissions which are excessive and will become

even more excessive.

73.     As a result of these Defendants' violations of their fiduciary duties they will wrongfully profit at the expense of the Fund by reaping a huge windfall in investment advisor fees which are excessive, and which are a product of their own wrongdoing.

74.     Accordingly, the Court should award damages to the Fund as proved at trial

## COUNT IV
**(For State Law Breach of Fiduciary Duty against Defendants Horejsi, J. Horejsi, Ciciora, Looney, BIA and SIA )**

75.     Plaintiff repeats and realleges paragraphs 1 through 57, as if set forth fully herein.

76.     Each of the defendants named in this count are fiduciaries and owe the Fund's shareholders the highest due of good faith, loyalty and fair dealing.

77.     In breach of these duties, each of these defendants knowingly engaged in a plan and scheme to pump up the market price of the Fund, so that the Rights Offering could be sprung on the unsuspecting shareholders to their detriment, but the financial benefit of Horejsi and his entities.

78.     The wrongful acts include the effecting and participation in the scheme, the dissemination of the material false and misleading Proxy Statements, and the dissemination of and the intended effectuation of the Rights Offering.

79.     The defendants' acts were taken to directly secure improper benefits for Horejsi, and his family and the management and service companies he controls. Defendant Looney is a long time Horejsi insider and knowingly acted in concert with the Horejsi family members to effect the scheme.

80.     While defendants Looney, Ciciroa and J. Horejsi as Directors were participants

and had full knowledge of the improper scheme, they withheld this information from the other Fund directors.

## COUNT V
### (For Permanent Injunction )

81.     Plaintiff repeats and realleges paragraphs 1 through 57, as if set forth fully herein.

82.     Plaintiff seeks to permanently enjoin the effectuation of the Rights Offering.

83.     The Rights Offering is coercive, and a product of the breach of fiduciary duty, and violations of section 20(a) of the ICA and state law.

84.     Plaintiff and the class will be irreparably harmed if the Rights offering is effected, since once the shares are issued and subscribed, there is no way to undo the harm, and money damages may not be an effective remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all other Class members, requesting the following:

A.     A determination that this action is a proper class action with respect to Counts I, II, and IV and certifying  the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating the Plaintiff as the class representative;

B.     A determination that the Proxy Statements were materially false and misleading and declaring that the vote obtained is null and void, and enjoining the consummation of the Rights Offering;

C.     A determination that the Investment Advisor Defendants have violated Section 36(b) of the ICA by charging or by planning to charge excessive investment advisor fees,

and by breaching their fiduciary duties by attempting to aggrandize their monetary return at the expense of the Fund, and awarding damages to the Fund;

        D.     A determination that the fiduciaries have violated their duties under the ICA and state law;

        E.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements;

        F.     Enjoining the Rights Offering; and

        G.     Granting of such other relief as the Court may deem just and proper.

## VIII.  **JURY DEMAND**

    Plaintiff demands a trial by jury.

Dated:   May  18, 2007        BADER & ASSOCIATES, LLC

                          s/ Gerald L. Bader, Jr.
                          Gerald L. Bader, Jr.
                          Renée B. Taylor
                          14426  East Evans Ave., #200
                          Denver, CO  80014
                          Phone:  303-534-1700
                          Fax:  303-534-1701
                          Email:    gbader@bader-associates.com
                                      rbtaylor@bader-associates.com

                          OF COUNSEL:

                          ROY JACOBS & ASSOCIATES
                          Roy L. Jacobs
                          60 East 42nd Street—46th Floor
                          New York, New York 10165
                          Phone: (212) 867-1156
                          Fax:    (212) 504-8343
                          Email: rjacobs@jacobsclasslaw.com

                          Attorneys for Plaintiff

<u>Address of Plaintiff</u>:

60 East 42nd Street, 46th Floor
New York, New York 10165